**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY TRUMBULL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12 C 0321 |
| | ) | |
| SCI ILLINOIS SERVICES, d/b/a/ | ) | |
| ROSEHILL CEMETERY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On May 30, 2012, Plaintiff Nancy Trumbull ("Trumbull") filed a Second Amended

Complaint against her former employer, SCI Illinois Services, Inc., d/b/a Rosehill Cemetery

("SCI"), alleging race and sex discrimination claims and a retaliation claim pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and 42 U.S.C. § 1981.  Before the

Court is SCI's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

For the following reasons, the Court grants SCI's summary judgment motion and dismisses this

lawsuit in its entirety.

**BACKGROUND**

**I.     Northern District of Illinois Local Rule 56.1**

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the

advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is

necessary."  *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).  Local

Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which

the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008).

Here, Trumbull has set forth additional facts in many of her Local Rule 56.1(b)(3)(B) Responses, and pursuant to the Local Rules, the Court will not consider these additional facts, but instead must rely on Trumbull's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005). Similarly, many of Trumbull's Local Rule 56.1(b)(3)(B) Responses contain factual and legal arguments that the Court will not address. *See Cady,* 467 F.3d at 1060; *see, e.g., BP Amoco Chem. Co. v. Flint Hills Res., LLC,* 615 F.Supp.2d 765, 769 (N.D. Ill. 2009). Also, in many of her Local Rule 56.1(b)(3)(B) responses, Trumbull denies facts, but fails to cite to the record in support of her denial, and thus the Court disregards the responses that do not properly cite to the record. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006); *Cichon,* 401 F.3d at 809-10.

As the Seventh Circuit teaches, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant

facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394,

398 (7th Cir. 2012). Also, "[e]mployment discrimination cases are extremely fact-intensive, and

neither appellate courts nor district courts are obliged in our adversary system to scour the record

looking for factual disputes...." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543-44 (7th Cir.

2011) (internal quotation marks and citation omitted). With these standards in mind, the Court

turns to the relevant facts of this case.

II.     **Relevant Facts**

        A.      **Introduction**

        In September 2007, SCI hired Trumbull, who is female and African-American, to work at

Rosehill Cemetery in Chicago, Illinois, as a Family Service Counselor. (R. 62, Def.'s Rule 56.1

Stmt. Facts ¶¶ 1, 5.) As a Family Service Counselor, Trumbull's job duties included working

with families who came to Rosehill Cemetery looking for information about burials. (*Id.* ¶ 10.)

Trumbull was also responsible for selling funeral and funeral-related products to Rosehill

Cemetery customers. (*Id.*) As a Family Service Counselor, Trumbull was at the cemetery six or

seven days a week. (*Id.*)

        In June 2008, Trumbull requested a transfer to the position of Community Service

Counselor. (*Id.* ¶ 11.) She requested the transfer because she believed Rosehill Cemetery

understaffed the Family Service area and that Rosehill did not have an effective call receiving

system. (*Id.*) Also, Trumbull believed a transfer would improve her "strained working

relationship" with Sales Manager Bob LaVoncher. (*Id.*) SCI approved the transfer and

Trumbull became a Community Service Counselor at Rosehill Cemetery on July 1, 2008. (*Id.*)

As a Community Service Counselor, Trumbull was no longer required to be at the cemetery

every day.  (*Id.* ¶ 12.)  Her duties also differed as a Community Service Counselor because she focused on community outreach and pre-need sales as opposed to sales that took place onsite at Rosehill Cemetery.  (*Id.*)

### B.    SCI's Policies and Procedures

At the beginning of her employment with SCI, Trumbull signed an employment agreement, and, under that agreement, Trumbull's employment was conditioned on her complying with SCI's policies and procedures.  (*Id.* ¶ 13.)  In addition, SCI provided Trumbull with a Family Services Guidebook and she completed training related to the guidebook in November 2007.  (*Id.* ¶ 17.)  Relevant to the present motion, the Family Services Guidebook defines "at need" cemetery sales as "[f]uneral or cemetery arrangements made at the time of death.  At need sales can include interment rights (land spaces, mausoleum or lawn crypts, niches or urn spaces), and merchandise such as bronze or granite markers, granite bases, vaults, monuments and vases."  (*Id.*)  On the other hand, SCI also offered "pre-need" contracts for sales of goods and services that were made in advance of death.  (*Id.* ¶¶ 15, 18; R. 85, Pl.s' Rule 56.1 Stmt. Add'l Facts ¶ 19.)

When she worked as a Family Service Counselor, SCI authorized Trumbull to sell both "at-need" and "pre-need" cemetery products and services.  (Def.'s Stmt. Facts ¶ 19.)  As a Community Service Counselor, however, Trumbull could only write pre-need contracts.  (*Id.*)  SCI compensated Trumbull entirely on commissions as a Community Service Counselor and because Community Service Counselors cannot make at-need sales, Trumbull did not receive any at-need commissions after she transferred positions.  (*Id.* ¶ 20.)

4

### C.     **August 2008 Pre-Need Contract**

On August 9, 2008, Rosehill Cemetery counselor Thomas Bornstein executed an at-need cemetery contract purchased by Rosehill Cemetery client Toni Henle.  (*Id.* ¶ 21.)  Specifically, Henle purchased an urn, installation, interment, and recording fees for the purpose of burying the cremated remains of her relative, Charles A. Hall, who had died on January 6, 2005.  (*Id.*)  This August 9, 2008 contract was later voided and Trumbull executed a pre-need contract covering the same services and merchandise for the same client on August 25, 2008.  (*Id.* ¶ 22.)  Trumbull received a commission for selling this pre-need contract.  (*Id.*)

SCI's policies and procedures did not allow for its sales counselors to write pre-need contracts for individuals who were already deceased.  (*Id.* ¶ 18.)  Once Sales Manager Bob LaVoncher and General Manager Larry Hayes found out that Trumbull had written a pre-need contract for someone who was deceased, they notified Chicago Market Director David Klein about the incident.  (*Id.* ¶ 24.)  Thereafter, Klein and Human Resources Manager Gary Ritter began an investigation into Trumbull's conduct by reviewing the contract and discussing the matter with Hayes, LaVoncher, and Trumbull's former direct supervisor, Bob Caramusa.  (*Id.*)  Klein then sent a letter to Trumbull about the investigation dated December 10, 2008, after which Trumbull called SCI's employee hotline, the "Careline" — a third-party hotline available to SCI employees to make workplace complaints and report ethical issues.  (*Id.* ¶¶ 28, 42.)  At that time, Trumbull accused Klein of harassing and threatening her because the messenger who delivered the letter was a white man.  (*Id.* ¶¶ 28, 57.)  After her Careline complaint about Klein, SCI did not ask Trumbull to meet with Klein at any point in the future, which Trumbull admits was an appropriate response to her concerns about Klein.  (*Id.* ¶ 58.)

Because Trumbull mentioned Klein in her Careline call, Ritter scheduled a meeting with Trumbull on January 7, 2009. (*Id*. ¶ 29.) At the January 2009 meeting, Ritter and Trumbull discussed the Henle pre-need contract and Trumbull explained that she wrote the contract as a pre-need contract because Henle's brother demanded the pre-need discount. (*Id*.) She also stated that her former supervisor Caramusa told her to write pre-need contracts when people were unsure when they would need the goods and services. (*Id*.) Thereafter, Chicago Managing Director Larry Michael spoke with Caramusa about his understanding of pre-need and at-need contracts. (*Id*. ¶ 30.) Michael believed that Trumbull was not telling the truth when she said Caramusa told her to write pre-need contracts when the customer was unsure when he would need the goods and services. (*Id*. ¶ 31.)

After the investigation, Klein recommended Trumbull's termination because she was compensated more for writing the Henle contract as a pre-need contract and that it was akin to "stealing from the company." (*Id*. ¶ 34.) Michael, who was the ultimate decision maker for all terminations concerning employees in the Chicago Market, decided that Trumbull's conduct was severe enough to warrant termination because it was deceptive and because she had been compensated more for the pre-need sale than she would have been for an at-need sale. (*Id*. ¶¶ 9, 33.) On February 18, 2009, Human Resources Manager Ritter notified Trumbull of her termination by letter. (*Id*. ¶ 35.)

### D.    Trumbull's Internal Complaints

Prior to her February 2009 termination, Trumbull made several internal complaints, including complaints about Sales Manager LaVoncher's conduct. On April 3, 2008, for example, Trumbull spoke with General Manager Hayes about an incident involving LaVoncher

that occurred on April 1, 2008, in which she complained that LaVoncher was unprofessional. (*Id.* ¶ 39.) After her conversation with Hayes, Trumbull contacted SCI Human Resources. (*Id.* ¶ 40.) Thereafter, Human Resources Manager Ritter investigated the incident by conducting employee interviews. (*Id.*) At that time, Trumbull did not complain to Ritter that race or sex was a factor in LaVoncher's actions toward her. (*Id.*) In fact, during the investigation, Trumbull said that her concerns about LaVoncher were not about race, but about his style. (*Id.*) It is undisputed that Trumbull was satisfied with Ritter's investigation and felt that Human Resources properly resolved her concerns about LaVoncher regarding this complaint. (*Id.*)

On June 1, 2008, Trumbull communicated with Hayes about another incident involving LaVoncher. (*Id.* ¶ 41.) Specifically, Trumbull stated that she had obtained approval to attend a friend's funeral on May 30, 2008, before returning to work at the cemetery, but that LaVoncher accused her of leaving the cemetery without permission and that he also hung up the phone on her. (*Id.*) On June 20, 2008, Plaintiff contacted SCI's employee hotline Careline. (*Id.* ¶ 42.) In her June 2008 call to Careline, Trumbull stated that LaVoncher subjected her to a greater degree of harassment because she is African-American and discriminated against her and another female employee. (*Id.* ¶ 43.) Later, when Human Resources interviewed Trumbull about this Careline call, she recanted her earlier statement saying LaVoncher never made any racial comments to her and that the transcription from the June 2008 Careline call was taken out of context. (*Id.* ¶¶ 44, 45.) Specifically, Trumbull stated that LaVoncher's conduct was harassing because he was indifferent and unprofessional. (*Id.* ¶ 45.) After the investigation, Human Resources issued LaVoncher a warning. (*Id.* ¶ 47.) The warning explained that during the investigation, SCI had substantiated that LaVoncher hung up on Trumbull and at times dismissed

her inquiries out of frustration. (*Id.*) It also stated that LaVoncher must be mindful when considering the delivery of his communications so that they are not perceived as threatening and/or offensive. (*Id.*)

On August 25, 2008, Trumbull contacted Careline and complained that she was not receiving messages from her client families who called Rosehill Cemetery and that General Manager Hayes had asked for her client information. (*Id.* ¶ 48.) Trumbull also complained that "because she is the only African American woman [], she wonders if she is being racially discriminated against." (*Id.* ¶ 49.) At her deposition, however, Trumbull could not remember, who, if anyone, she believed was discriminating against her at the time she made the August 25, 2008 Careline call. (*Id.*) Meanwhile, Manos Diakoumakis, SCI's Human Resources Manager, investigated Trumbull's August 25, 2008 Careline allegations and — after obtaining Rosehill Cemetery's telephone book — concluded that staff had taken down telephone messages from Trumbull's clients. (*Id.* ¶ 50.) Diakoumakis also determined that General Manager Hayes had the authority to ask Trumbull for her client information and was not singling her out. (*Id.*)

In addition, Trumbull called Careline on August 30, 2008 complaining that LaVoncher stole a sales lead from her. (*Id.* ¶ 52.) In particular, Trumbull testified that LaVoncher had told her that she could not write a stone order for a particular client because it was an at-need sale, and as a Community Service Counselor, she could not write at-need contracts. (*Id.*) When asked if LaVoncher had done anything improper, Trumbull stated that it was the manner in which he spoke to her. (*Id.*) Diakoumakis asked Market Manager Klein to investigate the August 30, 2008 Careline call, at which time Klein learned that market management had informed Trumbull on several occasions that she was not allowed to meet with at-need families. (*Id.* ¶ 53.) On

8

September 30, 2008, Trumbull met with Klein to discuss SCI's investigations into her Careline complaints. (*Id.* ¶ 54.) During that meeting, Trumbull signed a Careline resolution memorandum and wrote a note thanking Klein for "his efforts to resolve the current issues at Rosehill." (*Id.*) At that meeting, Trumbull informed Klein that someone had placed a keychain in her mailbox that said "I was put on this earth to make your life miserable." (*Id.* ¶ 55.) Klein told Human Resources about this incident and after conducting an investigation, Human Resources was unable to substantiate who put the keychain in Trumbull's mailbox. (*Id.*) Thereafter, Klein sent an investigation resolution memorandum to Trumbull about the keychain incident. (*Id.* ¶ 56.)

### E.    EEOC Charge and Federal Complaint

On April 2, 2009, Trumbull filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation in violation of Title VII. (Def.'s Stmt. ¶ 59.) The EEOC issued a Notice of Right to Sue Letter on October 19, 2011. (*Id.*) On January 17, 2012, Trumbull filed a pro se Complaint in the United States District Court for Northern District of Illinois against SCI, alleging sex discrimination and retaliation in violation of Title VII. (*Id.* ¶ 60.) The Court appointed counsel on January 19, 2012, after which Trumbull amended her allegations to include a claim of race discrimination in violation of Title VII and 42 U.S.C. § 1981, along with a supplemental state law claim. (*Id.*; R. 31, Second Am. Compl.) On September 13, 2013, the Court dismissed Trumbull's Title VII race discrimination claim because it was outside of the scope of her EEOC charge and also dismissed Trumbull's state law claim. (R. 51, 9/13/12, Minute Order.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "A plaintiff must begin to meet this burden by submitting admissible, supporting evidence in response to a proper motion for summary judgment." *Harney v. City of Chicago,* 702 F.3d 916, 925 (7th Cir. 2012).

## ANALYSIS

### I.     Race and Sex Discrimination

Trumbull brings her sex discrimination claim under Title VII and her race discrimination claim under 42 U.S.C. § 1981 — claims that the Court reviews under the same standard at summary judgment. *See Smiley v. Columbia Coll. Chicago,* 714 F.3d 998, 1002 (7th Cir. 2013). To establish that race or sex discrimination occurred, Trumbull may proceed under either the direct or indirect methods of proof. *See Brown v. Advocate So. Suburban Hosp.,* 700 F.3d 1101,

1104 (7th Cir. 2012). Under either method, the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan v. SVT, LCC,* ___ F.3d ___, 2013 WL 3944269, at *6 (7th Cir. Aug. 1, 2013). Trumbull seeks to establish race and sex discrimination under the direct method of proof.

Under the direct method of proof, a plaintiff "must demonstrate a triable issue as to whether discrimination motivated the adverse employment action." *Hanners v. Trent,* 674 F.3d 683, 691 (7th Cir. 2012) (citation omitted). Put differently, "[t]o prove employment discrimination, a plaintiff needs direct or circumstantial evidence 'that the decisionmaker has acted for a prohibited reason.'" *Harris v. Warrick County Sheriff's Dep't,* 666 F.3d 444, 448 (7th Cir. 2012) (citation omitted). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Hanners,* 674 F.3d at 691 (citation omitted). If a plaintiff does not present direct evidence of unlawful discrimination, such as an employer admission, she must present "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *See Brown,* 700 F.3d at 1105 (citation omitted). As the Seventh Circuit explains:

> The pieces of this mosaic generally take one of three forms. First, the plaintiffs may show evidence of suspicious timing, ambiguous behavior, statements or comments directed at employees in the protected group, and "other bits and pieces from which an inference of discriminatory intent might be drawn." Second, they may provide evidence that a "similarly situated employee received more favorable treatment." And third, they may provide evidence that the plaintiff "was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic, and that the employer's stated reason for the difference in treatment is unworthy of belief."

11

*Id.* (internal citations omitted). In the end, the circumstantial evidence must point directly to a discriminatory reason for the employer's action. *See Dass v. Chicago Bd. of Educ.,* 675 F.3d 1060, 1071 (7th Cir. 2012).

In its summary judgment motion, SCI maintains that it terminated Trumbull's employment because she violated SCI's policy that prohibits sales counselors from writing pre-need contracts for individuals who are already deceased. In particular, Larry Michael, the Chicago Managing Director and ultimate decision maker for all terminations concerning employees in the Chicago Market, decided that Trumbull's conduct was severe enough to warrant termination because it was deceptive and that she had been compensated more for the sale than she should have been. In response, Trumbull argues that under the direct method of proof, the evidence in the record demonstrates that SCI's alleged nondiscriminatory reason for terminating her employment is mere pretext for race or sex discrimination.

To establish pretext, Trumbull must show that SCI's reason for terminating her employment was a lie. *See Smiley,* 714 F.3d at 1002. The question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *See Collins v. American Red Cross,* 715 F.3d 994, 1000 (7th Cir. 2013) (citation omitted). More specifically, "[a]n unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie — not just an error, oddity, or oversight.'" *Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (citation omitted).

12

Viewing the facts and all reasonable inferences in Trumbull's favor — as the Court is required to do at this procedural posture — Trumbull has failed to set forth sufficient evidence creating a genuine factual dispute that SCI's proffered reason for terminating her employment was pretext for discrimination. In other words, she has not created a triable issue of fact on the question of whether SCI terminated her employment based on race or sex. *See Morgan*, ___ F.3d ___, 2013 WL 3944269, at *6.

In support of her pretext argument, Trumbull first contends that because SCI permitted other sales counselors to write pre-need contracts for the future burial of cremated remains, SCI's reason for her termination is pretext for discrimination. Trumbull's first argument dovetails with her argument that she has sufficient circumstantial evidence under the direct method of proof because SCI treated her differently from other sales counselors who engaged in similar misconduct. *See Martino v. Western & Southern Fin. Group,* 715 F.3d 195, 202 (7th Cir. 2013) ("An employee may show that his employer's explanation for an adverse action is pretextual by showing that similarly situated persons outside the protected class received more favorable treatment from the employer."). Although the similarly situated test is flexible, Trumbull must present some evidence that similarly situated comparators had the same supervisor, were subject to the same standards, and engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* "The purpose of the 'similarly situated' comparator element is to ensure that all other variables are discounted so that an inference of unlawful intent would be reasonable." *Silverman v. Board of Educ. of City of Chicago,* 637 F.3d 729, 742 (7th Cir. 2011).

In support of her similarly situated argument, Trumbull relies on General Manager Hayes deposition testimony that sometimes sales counselors would use the wrong contract, that this happened more than 15 times, and that he could not remember anyone who was fired for erroneously using a pre-need contract.  (Pl.'s Stmt. Facts ¶¶ 4, 6.)[1]  Trumbull also sets forth evidence of two comparators, albeit in a response to SCI's Local Rule 56.1(a)(3) Statement ¶ 32, neither of whom improperly wrote a pre-need contract for a deceased individual.  Not only does Trumbull present her additional facts in response to SCI's Rule 56.1 Statement ¶ 32, many of her factual assertions do not cite to the record.  As discussed above, the Court is reluctant to consider the additional facts and arguments made in Trumbull's Local Rule 56.1(b)(3)(B) Responses, especially because SCI has not had the opportunity to properly respond.  *See Keeton v. Morningstar, Inc.,* 667 F.3d 877, 883-84 (7th Cir. 2012) ("district courts are entitled to expect strict compliance with Local Rule 56.1").  Accordingly, under the circumstances, it is nearly impossible for the Court to make a meaningful similarly situated comparison to determine if SCI intentionally discriminated against Trumbull.  *See Martino,* 715 F.3d at 202-03.

Nevertheless, Trumbull argues that Tom Bornstein, a non-African American male and former SCI employee, violated SCI's internment verification procedure, and instead of being terminated, SCI gave him a written warning.  Trumbull also maintains that Tom Hetman, a non-African American male, who was a former SCI sales counselor, admitted to lying to General Manager Hayes, yet SCI did not terminate his employment.  Under a common sense approach and the facts in the record, it is unclear whether lying to a supervisor and violating SCI's

---

[1] Relying on her Statement of Additional Facts ¶ 7, Trumbull also maintains that Chicago Market Director David Klein did not recall anyone being disciplined for writing the wrong kind of contract.  Paragraph 7 makes no such statement.

internment verification procedure is the same or similar conduct to Trumbull's conduct in relation to the Henle pre-need contract and the investigation into the Henle contract. *See Majors v. General Elec. Co.*, 714 F.3d 527, 538 (7th Cir. 2013) ("the similarly situated analysis is flexible, and the result depends on any relevant factors and common sense."). Indeed, missing from the record are details concerning Hetman's or Bornstein's misconduct and the circumstances surrounding SCI's investigation and discipline of them.[2] More specifically, Trumbull has failed to provide sufficient facts concerning these sales counselors' similarity to her, including whether their supervisors or the final decision makers concluded that they were deceptive or untruthful during the investigations into their misconduct. *See Fleishman v. Continental Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012) ("To survive summary judgment, the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor."). Trumbull's similarly situated argument is further undermined by the undisputed fact that she is not aware that the decision maker in this matter, Michael, along with the people he consulted, Klein or Ritter, treated her any differently than a male or non-African American employee for writing a pre-need contract for a deceased individual. (*Id*. ¶ 38.) In short, Trumbull has not demonstrated triable factual issues that Hetman and Bornstein engaged in similar conduct because she has not presented sufficient

---

[2] Trumbull also points out that Bornstein and Hetman did not file any internal complaints with Careline. In the context of Trumbull's sex and race discrimination claim, however, the relevant questions are whether Bornstein and Hetman had the same supervisors, were subject to the same standards, and engaged in the same or similar misconduct that was the basis of Trumbull's termination. *See Martino v. Western & Southern Fin. Group,* 715 F.3d 195, 202 (7th Cir. 2013). Trumbull's internal complaints via Careline are relevant to her statutorily protected activity in her retaliation claim. *See Hobgood v. Illinois Gaming Bd.*, 722 F.3d 1030, 1036 (7th Cir. 2013).

commonalities in their conduct. *See Coleman*, 667 F.3d at 841 ("the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision.").

Thus, Trumbull's similarly situated argument does not demonstrate a triable issue as to whether race or sex discrimination motivated SCI's decision to terminate her employment. *See Hanners*, 674 F.3d at 691. In fact, the circumstantial evidence Trumbull presents does little to chip away at SCI's nondiscriminatory reason for terminating Trumbull employment, especially because Trumbull admits that SCI believed that she violated SCI's company policies. (Def.'s Stmt. Facts ¶ 37.) Also, there is undisputed evidence in the record that Michael, the final decision maker, believed that Trumbull was untruthful, and "[p]retext does not exist if the decision-maker honestly believed the nondiscriminatory reason for its employment action." *Smiley*, 714 F.3d at 1002 (internal citation omitted); *see also Hill v. Tangherlini*, ___ F.3d ___, 2013 WL 3942935 (7th Cir. Aug. 1, 2013) ("An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness").

Next, Trumbull maintains that she can establish pretext because her former manager, Bob Caramusa, instructed her to draft pre-need contracts for cremated remains. Trumbull, however, improperly supports her argument because she adds this fact to her response to SCI's Local Rule 56.1(a)(3) Statement of Facts. To clarify, SCI's Statement ¶ 23 states: "Plaintiff knew, at the time she wrote the preneed contract for Ms. Henle, that the purpose of the contract was to bury a deceased person's remains." In her Local Rule 56.1(b)(3)(B) Response, Trumbull denied this statement and added facts, namely, that she asked Caramusa for guidance on how to write the Henle contract. (R. 85, Pl.'s Resp. ¶ 23.) Assuming that Trumbull had properly set forth this

16

fact in her Local Rule 56.1(b)(3)(C) Statement of Additional Facts, whether Caramusa told Trumbull to write the contract as a pre-need contract does not raise a reasonable inference that SCI's explanation for Trumbull's termination was a lie. At best, Trumbull has established that Caramusa gave her bad advice that she followed. *See Ellis v. UPS, Inc.,* 523 F.3d 823, 828 (7th Cir. 2008) ("Evidence that an employer made a mistake or that the decision was ill-advised cannot meet [the pretext] burden; an employer's explanation is a pretext for discrimination only if it is a lie.").[3]

In addition, Trumbull contends that she can establish pretext because SCI failed to conduct a proper investigation into the August 2008 Henle contract and terminated her employment in contravention of SCI's ordinary course of business. In support of this argument, Trumbull asserts that SCI relied upon LaVoncher, who was biased against her, to investigate the August 2008 contract issue and that LaVoncher influenced SCI's management to terminate Trumbull's employment under the "cat's paw" theory of liability. *See Johnson v. Koppers,* ___ F.3d ___, 2013 WL 4022294 (7th Cir. Aug. 8, 2013). To clarify, "the cat's paw theory requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Id.*; *see also Cook v. IPC Int'l Corp.,*

---

[3] Trumbull also argues that General Manager Hayes and his staff reviewed the pre-need contract at issue, although Trumbull fails to properly cite to the record to support this statement. (*See* R. 85, Pl.'s Resp. ¶ 23.) Any argument that Hayes' review of the contract and his failure to correct any mistakes establishes pretext is unavailing, especially because this circumstantial evidence does not point directly to a discriminatory reason for Trumbull's termination. *See Fleischman v. Continental Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012). Furthermore, Trumbull admits that Hayes did not take any actions against her that were based on race or sex discrimination. (Def.'s Stmt. Facts. ¶ 48.)

673 F.3d 625, 628 (7th Cir. 2012) ("the 'cat's paw' metaphor refers to a situation in which an

employee is fired or subjected to some other adverse employment action by a supervisor who

himself has no discriminatory motive, but who has been manipulated by a subordinate who does

have such a motive and intended to bring about the adverse employment action").

Trumbull's argument that LaVoncher manipulated the final decision maker, Michael, to

terminate her employment is simply not supported by the record. Trumbull points to her

response to SCI's Rule 56.1 Statement ¶ 25, and although the citations to the record in her

response support the fact that Chicago Market Director David Klein relied on information from

LaVoncher, Trumbull's other citations to the record do not support any inference that LaVoncher

influenced SCI's management to terminate Trumbull's employment. Moreover, it is undisputed

that Human Resources Manager Gary Ritter and Klein conducted the investigation into the

August 2008 contract — not LaVoncher — and that Ritter and Klein relied not only on

information provided by LaVoncher, but also information from General Manager Hayes and

Trumbull's former direct supervisor, Caramusa. Also, it is undisputed that Michael conducted

an independent investigation into Trumbull's conduct. (Def.'s Stmt. Facts ¶¶ 30-32.)[4]

Therefore, Trumbull's unsubstantiated argument that LaVoncher was responsible for SCI's

decision to terminate her employment fails. *See Long v. Teachers' Retirement Sys. of Ill.,* 585

F.3d 344, 352 (7th Cir. 2009) (final decision maker's independent investigation absolved

---

[4] Although Trumbull denies SCI's Statements ¶¶ 30-32, her Local Rule 56.1(b)(3)(B) Response does not refute the statements concerning Michael's independent review. Instead, Trumbull challenges the underlying facts and conclusions that Michael made when conducting his independent review. *See Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528 (7th Cir. 2000) (requirements for Rule 56.1 responses "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted.").

defendant of liability under cat's paw theory).

Taken as a whole, Trumbull's circumstantial evidence would not permit a trier of fact to infer that race or sex discrimination motivated Michael's decision to terminate her employment because this evidence does not point directly to discrimination based on sex or race and Michael honestly believed the nondiscriminatory reason for terminating Trumbull's employment.  *See Morgan,* ___ F.3d ___, 2013 WL 3944269, at *4 ("the circumstantial evidence must be strong enough, taken as a whole, to allow the trier of fact to draw the necessary inference"); *see also Dass,* 675 F.3d at 1073 ("The circumstantial evidence a plaintiff presents 'must point directly to a discriminatory reason for the employer's action'") (citation omitted).  Moreover, although the record reflects that Trumbull and LaVoncher had a contentious relationship during Trumbull's tenure at Rosehill Cemetery, there is no evidence in the record that LaVoncher influenced or manipulated Michael's decision to terminate Trumbull's employment.  *See Johnson,* ___ F.3d ___, 2013 WL 4022294; *Cook,* 673 F.3d at 628.  The Court therefore grants SCI's motion for summary judgment as to Trumbull's race and sex discrimination claims.

## II.     Retaliation

In her Second Amended Complaint, Trumbull also brings a retaliation claim under both Section 1981 and Title VII.  The "substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981." *Smith v. Bray,* 681 F.3d 888, 896 (7th Cir. 2012).  A plaintiff may prove retaliation under either the direct or indirect methods of proof.  *See Majors v. General Elec. Co.,* 714 F.3d 527, 537 (7th Cir. 2013); *Northington v. H & M Int'l,* 712 F.3d 1062, 1065 (7th Cir. 2013).  "The direct method requires proof that (1) the employee engaged in statutorily protected activity; (2) she

19

suffered an adverse employment action; and (3) a causal link exists between the two." *Majors,*

714 F.3d at 537; *see also Hoppe v. Lewis Univ.,*692 F.3d 833, 841 (7th Cir. 2012). Under the

indirect method of proof, a plaintiff must establish a prima facie case of retaliation as follows:

(1) she engaged in a statutorily protected activity; (2) she was meeting her employer's legitimate

job expectations; (3) she suffered an adverse action; and (4) her employer treated her less

favorably than similarly situated employees who did not engage in protected activity. *See*

*Majors,* 714 F.3d at 537. Once "a plaintiff claiming retaliation produces evidence that could

establish all four elements, the burden shifts to the defendant to offer a nondiscriminatory reason

for the adverse action." *Vaughn v. Vilsack,* 715 F.3d 1001, 1006 (7th Cir. 2013). "If the

defendant identifies an appropriate reason, the burden shifts back to the plaintiff to supply proof

that the proffered reason is pretextual." *Id.*

In response to SCI's summary judgment motion, Trumbull attempts to establish

retaliation under both the direct and indirect methods of proof. As discussed in detail above,

Trumbull has failed to supply sufficient proof that SCI's nondiscriminatory reason for

terminating her employment is pretext, and thus her attempt to show retaliation under the

indirect method of proof is unavailing. The Court thus turns to the direct method of proof.

Under the direct method, Trumbull must first establish that she engaged in a statutorily

protected activity. *See Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003) ("It is

axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate

against her for engaging in statutorily protected activity."). "An employee engages in a

protected activity by either: (1) filing a charge, testifying, assisting or participating in any

manner in an investigation, proceeding or hearing under Title VII or other employment statutes;

20

or (2) opposing an unlawful employment practice." *Northington,* 712 F.3d at 1065; *see also*

*O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 631 (7th Cir. 2011).

Although Trumbull does not specifically articulate the statutorily protected activity in her legal memorandum, viewing the evidence and all reasonable inferences in her favor — for purposes of this summary judgment motion — Trumbull's internal complaints constitute the relevant statutorily protected activity under the circumstances. *See Northington,* 712 F.3d at 1065. Specifically, in Trumbull's June 20, 2008 Careline call, she complained that LaVoncher harassed her because she was African-American, although Trumbull later recanted her statement explaining that LaVoncher harassed her because he was indifferent and unprofessional. Trumbull also stated in her June 20, 2008 call that LaVoncher discriminated against her and another female employee. In her August 25, 2008 complaint, Trumbull stated that because she is the only African American woman at Rosehill Cemetery, she wondered if she was being racially discriminated against. Trumbull's only other internal complaint that related to her race or gender involved Klein allegedly harassing her by sending her a December 2008 letter via a white, male messenger, although Trumbull fails to give any further context to this allegation, and it is well-established that "vague and obscure 'complaints' do not constitute protected activity." *Id.*

Because the parties do not dispute that Trumbull suffered an adverse action, the Court turns to whether she has established a causal link between her termination and her internal complaints. To this end, Trumbull argues that LaVoncher exerted significant influence over the investigation into Trumbull's August 2008 pre-need contract, as well as SCI's decision to terminate her employment. As discussed, there is no evidence in the record that LaVoncher had "excessive control" over the information that was relayed to the investigation team nor is there

any evidence that LaVoncher manipulated SCI, more specifically, Michael, into terminating

Trumbull's employment. Trumbull also argues that General Manager Hayes was an

impermissibly biased member of the investigation team because Hayes failed to offer a

satisfactory resolution concerning her dispute with LaVoncher — although Trumbull admits that

Hayes did not take any actions against her that were based on race or sex discrimination. (Def.'s

Stmt. Facts ¶ 48.) Similarly, Trumbull asserts that Klein's conduct was suspicious because Klein

was aware of Trumbull's complaints of LaVoncher's misconduct, some of which were around

the time he conducted the investigation into the August 2008 pre-need contract. Trumbull's

arguments concerning Hayes' impermissible bias and Klein's knowledge of the complaints are

speculative and "conjecture alone cannot defeat a summary judgment motion." *Delapaz v.*

*Richardson,* 634 F.3d 895, 901 (7th Cir. 2011). Further, construing Trumbull's argument that

Klein knew about her complaints against LaVoncher at the time of the Henle contract

investigation as a "suspicious timing" argument, this suspicious timing, alone, is insufficient to

create a triable issue of fact that a causal link existed between Trumbull's termination and her

internal complaints. *See Milligan v. Board of Trs. of So. Ill. Univ.,* 686 F.3d 378, 390 (7th Cir.

2012).

Here, it is undisputed that Chicago Market Director David Klein and SCI's Human

Resources Manager Gary Ritter ran the investigation into Trumbull's August 2008 pre-need

contract. It is also undisputed that after the investigation, Klein recommended Trumbull's

termination because she was compensated more for writing the August 2008 contract as a pre-

need contract and that this was akin to "stealing from the company." Thereafter, the final

decision maker Michael decided that Trumbull's conduct was severe enough to warrant

22

termination because it was deceptive and because she had been compensated more for the pre-need sale than she would have been for an at-need sale.  Viewing the evidence and all reasonable inferences in Trumbull's favor, her argument that she can establish a causal connection between her termination and her internal complaints because LaVoncher harbored a retaliatory animus towards her, had direct influence over the investigation, and that his retaliatory animus must be imputed to Michael is too attenuated and not supported by the record.  *See Hicks v. Forest Preserve Dist. of Cook County, Ill.,* 677 F.3d 781, 790 (7th Cir. 2012).  Therefore, the Court grants SCI's summary judgment motion as to Trumbull's retaliation claim.

## CONCLUSION

For these reasons, the Court grants Defendant's motion for summary judgment and dismisses this lawsuit in its entirety.  The Court thanks Plaintiff's appointed counsel for their work on this matter.

**Dated:**  September 10, 2013

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**

23